## United States District Court
## District of New Jersey

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. James B. Clark III |
| | : | |
| v. | : | Mag. No. 22-10299 |
| | : | |
| DAVID W. SCHAMENS | : | **CRIMINAL COMPLAINT** |

I, James L. Gallo, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

James L. Gallo, Special Agent
Homeland Security Investigations

Special Agent Gallo attested to this Complaint by telephone pursuant to FRCP 4.1(b)(2)(A).

Sworn to before me and subscribed in my presence,
on March 4, 2022 at Newark, New Jersey

Honorable James B. Clark III
United States Magistrate Judge

Signature of Judicial Officer

## ATTACHMENT A

### Count One
### (Wire Fraud)

From in or around 2014 through in or around June 2021, in Hudson County, in the District of New Jersey and elsewhere, defendant

DAVID W. SCHAMENS

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud victim investors and to obtain money and property from victim investors by means of materially false and fraudulent pretenses, representations and promises, and, for purposes of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce certain writings, signs, signals, pictures and sounds, to wit, an interstate wire transfer of approximately $100,000 made by Victims-3 and -4 on or about January 23, 2019 that traveled through New Jersey.

In violation of Title 18, United States Code, Sections 1343 and 2.

## Count Two
### (Securities Fraud)

From in or about 2014 through in or around June 2021, in Hudson County, in the District of New Jersey and elsewhere, defendant

### DAVID W. SCHAMENS

by use of the means and instrumentalities of interstate commerce, the mails, and facilities of national securities exchanges, directly and indirectly, did knowingly and willfully use manipulative and deceptive devices and contrivances in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5 in connection with the purchases and sales of securities, namely shares in TFG Trading, LLC, TD Trading, LLC, and TradeStream Algo Fund LP, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

## Count Three
## (Money Laundering)

From in or about 2014 through in or around June 2021, in Hudson County, in the District of New Jersey and elsewhere, defendant

### DAVID W. SCHAMENS

did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

**ATTACHMENT B**

I, James L. Gallo, am a Special Agent with Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I have conducted an investigation and discussed this matter with other law enforcement officers, who have participated in this investigation and who have knowledge of the following facts. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates, locations, quantities, and dollar amounts described in this affidavit are approximate, and all conversations and statements described in this affidavit are related in substance and in part.

## I.   Overview

1.     From as early as 2014 through as recently as in or around June 2021, defendant DAVID W. SCHAMENS ("SCHAMENS") engaged in an investment fraud scheme.  Specifically, SCHAMENS fraudulently induced victim investors (the "Victim Investors") to invest in one or more entities operated by SCHAMENS under the promise of rates of return ("ROR") varying anywhere from 12% to 30% annually.  In reality, however, SCHAMENS was running a Ponzi scheme and stealing the Victim Investors' funds.

2.     Specifically, SCHAMENS used the Victim Investors' funds to: (a) finance his own lifestyle and make various personal expenditures, including vacations, payments on a luxury vehicle, and a down payment on a million-dollar home; (b) pay back prior Victim Investors in the manner of a Ponzi scheme; and (c) make various other expenditures unrelated to the investments made by the Victim Investors.

3.     In order to conceal and disguise the nature, location, source, and control of the Victim Investors' funds, SCHAMENS often moved the funds through several different bank accounts that he controlled before the funds reached their final destination, at which point SCHAMENS used them for some non-investment related purpose.

4.     SCHAMENS further took various steps to hide the fraudulent scheme from the Victim Investors and to maintain their trust, including by: (a) providing Victim Investors with fabricated monthly account statements related to their investments; (b) emailing Victim Investors fabricated K-1 statements that falsely represented gains associated with their investments; and (c) providing Victim Investors bogus explanations for delayed and/or incomplete dividend payments and/or redemptions.

4

5.      SCHAMENS defrauded more than approximately 25 Victim Investors in the above manner, including Victim-1 through Victim-7, resulting in aggregate losses of approximately $6.8 million.

## II.     **Relevant Terms and Entities**

6.      At times relevant to this Complaint:

a.      SCHAMENS was a resident of North Carolina.

b.      SCHAMENS managed and operated various entities used to solicit investments from members of the general public, including TD Trading LLC ("TD"), TFG Trading LLC ("TFG"), TradeStream Analytics LTD ("TradeStream"), Tradedesk Financial Group, Inc. ("Tradedesk"), and Tradestream Algo Fund LP ("the Algo Fund"), among others (collectively, the "SCHAMENS Entities").

c.      TD was registered as a Delaware limited liability company in or around July 2013. SCHAMENS was a signatory to bank accounts held under the name "TD Trading LLC" at Bank-1.

d.      TFG was a Delaware limited liability company registered in or around April 2015. SCHAMENS was the sole signatory to bank accounts held by TFG at Banks-1 and -2.

e.      TradeStream was registered as a Delaware corporation in or around April 2007. SCHAMENS was the sole signatory to an account held by TradeStream at Banks-2 and -3.   SCHAMENS was also the sole signatory to an account held by TradeStream under the business name, "Bold Analytics LTD d/b/a TradeStream" at Bank-1.

f.      Tradedesk was registered as a Delaware corporation in or around February 2007.   SCHAMENS was the sole signatory to bank accounts held by Tradedesk at Bank-1, Bank-2, and Bank-3.

g.      The Algo Fund was registered as a Delaware limited partnership in or around February 2019. SCHAMENS was a signatory to bank accounts held by the Algo Fund at Bank-1 and Bank-2.

h.      All of the accounts associated with the SCHAMENS' Entities at Bank-2 were opened at a Bank-2 location in Florham Park, New Jersey and listed a New Jersey address on account opening documents.

i.      Bank-1, Bank-2, and Bank-3 were financial institutions as defined in Title 18, United States Code, Section 1956(c)(7), and Title 31, United States Code, Section 5312.

j.       Entity-1 was a financial services company headquartered in Onaga, Kansas that provided custodial services for self-directed Individual Retired Accounts ("IRAs").

k.       Entity-2 was a financial services company headquartered in Oak Brook, Illinois that provided custodial services for investments and retirement accounts, including IRAs.

l.       Entity-3 was a digital infrastructure company headquartered in California with a data center located in Secaucus, New Jersey that processed data for several of the SCHAMENS Entities, including TradeStream.

m.       The Federal Deposit Insurance Company ("FDIC") was an independent agency that insured deposits in banks and savings associations.

n.       The Securities Investor Protection Corporation ("SIPC") was a non-profit membership corporation that provided insurance to customers holding currency and securities at SIPC-member brokerage firms.

o.       Victim-1 was a resident of Florida.

p.       Victim-2 was a resident of Florida.

q.       Victim-3 and Victim-4 were married and residents of Virginia.

r.       Victim-5 was a resident of California.

s.       Victim-6 was a resident of Maryland.

t.       Victim-7 was a resident of Australia.

### III.   SCHAMENS' Fraudulent Businesses

### A.   TD and TFG

7.       According to representations made by SCHAMENS to the Victim Investors, investments in the TD and TFG (the "Trading Groups") would be used to fund short-term investment loans made to day traders (the "Day Traders") who would conduct trading activity on the TradeStream platform.   SCHAMENS assured the Victim Investors that the Trading Groups' profits would be derived from fees imposed on the Day Traders and not from the profitability of the trades made by the Day Traders through TradeStream.

8.      According to a TD investor presentation (the "TD Investor Presentation"), which was provided to at least one of the Victim Investors:

        i.      Cash deposits made by investors were SIPC insured on behalf of TD's "clearing firm" and FDIC insured by a custodian bank;

        ii.     Cash deposits were "not at risk" because those funds would only provide buying power to the Day Traders and were not going to be used in trading;

        iii.    The ROR on the cash deposits would be "based on trading volume and the routing fees that TradeStream charges and reimburses TD Trading, LLC for." The TD Investor Presentation provided the following example: "a trader buys 1000 shares. TradeStream charges, depending on where executed, between $.0010 and $.0015 per share for routing. TradeStream shares this routing fee to TD Trading, LLC Class A members for use of capital by the Class B member traders[1] in generating trades;" and

        iv.     Investor funds could be withdrawn "without penalty" during the first 10 business days of the trading month and the funds were "always held as cash, not traded."

Based on this investigation, SCHAMENS made similar (false) representations to Victim Investors about how TFG purported to operate.

9.      SCHAMENS accepted funds from the Victim Investors for investment in the Trading Groups primarily into one of three different bank accounts controlled by SCHAMENS at Bank-1: (1) an account held in the name "TD Trading" ending in 6431 ("the Bank-1 TD Account"); (2) an account held in the name "TFG Trading Fund" ending in 9749 (the "Bank-1 TFG Account"); and (3) an account held in the name "Tradedesk Financial Group" ending in 2714 (the "Bank-1 Tradedesk Account") (collectively, the "Bank-1 Trading Group Accounts").

10.     SCHAMENS received funds into the Bank-1 Trading Group

---

[1] "Class A members" were the victim investors who were investing capital in one of the Trading Groups and "Class B members traders" were purportedly the Day Traders trading on the TradeStream platform.

Accounts in one of two ways: (1) Victim Investors wired or transferred funds directly to one or more of the Bank-1 Trading Group Accounts; or (2) Victim Investors transferred portions of IRAs held at Entity-1 and Entity-2 to one of the Bank-1 Trading Group Accounts.

11.     Based on this investigation, SCHAMENS periodically provided Entity-1 and Entity-2 with information regarding the purported value of the investments made by those Victim Investors who invested portions of their IRAs through Entity-1 and Entity-2. A review of bank records associated with the investments revealed that SCHAMENS provided to Entity-1 and Entity-2 false valuation information.

12.     At various times since in or around 2016, and particularly starting in or around 2018, Victim Investors who made investments in the Trading Groups demanded the return of their funds. SCHAMENS returned some Victim Investor funds, in part by using incoming funds from other Victim Investors in the manner of a Ponzi scheme. Since in or around 2018, however, SCHAMENS has not returned all requested funds to Victim Investors who made withdrawal demands. Instead, SCHAMENS has strung along the Victim Investors through misrepresentations and false promises.

13.     To date, the investigation has identified at least approximately four Victim Investors who invested in one of the Trading Groups and who have suffered collective losses of approximately $3.35 million, including Victim-1 through Victim-4, as set forth below.

## B.     The Algo Fund

14.     In or around 2019, SCHAMENS began to solicit investment in the Algo Fund. According to an investor presentation regarding the Algo Fund (the "Algo Fund Investor Presentation"), which was provided to at least one of the Victim Investors, the Algo Fund was a "proprietary algorithmic trading fund" that purported to be a customer of TradeStream. The Algo Fund Investor Presentation additionally provided:

a.     Funds invested in the Algo Fund were SIPC insured on behalf of the Algo Fund's "clearing firm" and FDIC insured by a custodian bank;

b.     Investor funds would be "auto traded" by algorithms managed by TradeStream and subscribed to by the Algo Fund;

8

c.     The Algo Fund would invest in stocks and ETFs based on volume, trends, and volatility measurements and no more than 10% of the Algo Fund would be traded in any one security;

d.     Investor funds would be withdrawn "upon notice during the first 10 business days of each quarter end month;"

e.     The Algo Fund would use "state of art servers" located in the same data center network as the New York Stock Exchange and the NASDAQ;

f.     Investors would be assessed an annual "admin fee" of less than .5% of the investors' assets. The presentation further boasted that it would not assess any performance or advisory fees; and

g.     Between June 1, 2019 and May 31, 2021, the Algo Fund had significantly outperformed the Dow Jones, NASDAQ, and the S&P 500.

15.     According to an offering memorandum provided by SCHAMENS to Victim Investors (the "Algo Fund Offering Memo"), the Algo Fund was "formed for the purpose of aggregating investor funds raised pursuant to this offering and to manage and invest such funds." The Algo Fund Offering Memo further stated that the Algo Fund would "seek to provide an economic return to investors through capital appreciation of securities in the Partnership's portfolio and through realization of income from such securities and gain from their sale." SCHAMENS represented to prospective investors that the Algo Fund would generate consistent monthly profits for the fund's investors. Victim Investors who invested in the Algo Fund were additionally directed by SCHAMENS to sign a subscription agreement (the "Algo Fund Subscription Agreement"), which indicated that the subscription was for "investment purposes only."

16.     Schamens accepted funds from the Victim Investors for investment in the Algo Fund into accounts controlled by SCHAMENS at Bank-1 (the "Bank-1 Algo Fund Account") and Bank-2 (the "Bank-2 Algo Fund Account") (collectively, the "Algo Fund Bank Accounts").

17.     Similar to the Trading Groups, SCHAMENS received funds into the Algo Fund Bank Accounts in one of two ways: (1) Victim Investors wired or transferred funds directly to one or more of the Algo Fund Bank Accounts; or (2) Victim Investors transferred portions of IRAs held at Entity-1 to one of the Algo Fund Bank Accounts. As with the Trading Groups, SCHAMENS provided Entity-1 with fake records regarding the health of the Victim Investors' investments with the Algo Fund.

18.     To date, the investigation has identified at least approximately 25

9

Victim Investors who invested in the Algo Fund and who have suffered collective losses of approximately $3.45 million, including Victims-5 through -7, as set forth below.

## IV.   SCHAMENS' Misappropriation and Laundering of Victim Funds

19.   A review of bank records associated with the investments made by the Victim Investors has revealed that SCHAMENS did not invest the funds as promised. Rather, the funds were largely used to: (a) finance Schamens' lifestyle; (b) pay back prior victims in the manner of a Ponzi scheme; and (c) finance other expenditures unrelated to the investments made by the Victim Investors. Further, in order to conceal the source of the Victim Investors' funds, SCHAMENS often moved the funds through several different bank accounts SCHAMENS controlled before the funds reached their final destination.   The below examples are illustrative of the manner in which SCHAMENS operated his scheme.

### Victim-1

20.   After Victim-1 met SCHAMENS in or around 2014, SCHAMENS told Victim-1 that he operated an investment group that loaned money to day traders using funds derived from private investors.   Subsequently, through SCHAMENS, Victim-1 invested in the Trading Groups, specifically TD and TFG.

21.   Between September 24, 2014 and August 21, 2018, Victim-1 made several investments in the Trading Groups on behalf of himself, his wife, and his company (the "Victim-1 Company").   In each instance, the investments were made through either Entity-1 or Entity-2 or through direct bank transfers.   In total, Victim-1, Victim-1's wife, and the Victim-1 Company invested approximately $3.2 million in the Trading Groups.

22.   In or around January 2016, Victim-1 made a redemption request for $50,000. The redemption was provided to Victim-1 in two separate bank transfers of approximately $25,000 each in January 2016 and April 2016 respectively.   At least one of the $25,000 redemption payments made to Victim-1 was paid with funds obtained from another Victim Investor.

23.   Over the life of Victim-1's investments, SCHAMENS provided Victim-1 with monthly account statements for the investments made by Victim-1, Victim-1's wife, and the Victim-1 Company (the "Victim-1 Investments").   The

account statements purported to show that the Victim-1 Investments were secure and generating positive returns on a monthly basis. For example, in or around February 2018, Victim-1 received an account statement that purported to show the balance of Victim-1's investments in the Trading Groups for January 2018 (the "January 2018 Account Statement"). A review of the January 2018 Account Statement revealed that Victim-1's account with Tradedesk had generated a 1.76% return for the month of January 2018 and had grown approximately $62,000 during the month. Based on a review of bank records associated with the Trading Accounts described below, the January 2018 Account Statement, like all monthly statements provided to Victim-1, was fake.

24.     A review of bank records associated with the Victim-1 Investments revealed that SCHAMENS did not invest Victim-1's funds as promised. Rather, SCHAMENS funneled the money through various successive transfers to accounts that he controlled and ultimately used the funds to: (a) finance SCHAMENS' lifestyle; (b) pay personal debts, including legal fees; (c) pay back prior victims in the manner of a Ponzi scheme; and (d) finance other expenditures unrelated to the investments made by Victim-1. For example:

> i.      On July 15, 2016, Victim-1 wired $200,000 into the Bank-1 TFG Account for investment in TFG. At the time of the transfer, the Bank-1 TFG Account had a balance of $1.88. Shortly after the funds entered the Bank-1 TFG Account, $200,000 was transferred out to the Bank-1 Tradedesk Account. At the time of the transfer, the Bank-1 Tradedesk Account had a balance of approximately $33,000.

> ii.     On July 15, 2016, $140,000 was transferred from the Bank-1 Tradedesk Account to an account held in the name of a law firm based in Charlotte, North Carolina ("Law Firm-1"). Based on this investigation, Law Firm-1 has no apparent affiliation to any investments made by the Victim Investors.

> iii.    On July 21, 2016, an additional transfer in the amount of $30,640 was sent from the Bank-1 Tradedesk Account to a law firm in Florham Park, New Jersey ("Law Firm-2"). Further investigation revealed that Law Firm-2 represented SCHAMENS in a civil dispute involving a separate investment scheme.

> iv.     From July 15, 2016 through July 26, 2016, $37,000

11

was transferred from the Bank-1 Tradedesk Account to a Bank-1 account held in the name of Bold Analytics Ltd. dba TradeStream Analytics, Ltd (the "Bank-1 Bold Analytics Account"). SCHAMENS was the sole signatory to the Bank-1 Bold Analytics Account. At the time of the transfer, the Bank-1 Bold Analytics Account had a balance of $2,175.29.

v.    During the same time, $13,100 was transferred from the Bank-1 Bold Analytics Account to a Bank-1 account held by SCHAMENS personally (the "Bank-1 SCHAMENS Account"). An analysis of the Bank-1 SCHAMENS Account revealed that the funds were used largely for personal expenses.

25.    In or around 2018, Victim-1 learned that another Victim Investor ("Victim-2") had difficulty withdrawing funds from his account with the Trading Groups. After learning about Victim-2's inability to readily withdraw funds, Victim-1 requested a $500,000 redemption from SCHAMENS on behalf of the Victim-1 Company to determine if there were any funds in the account.

26.    Between March 14, 2019 and June 10, 2019, Victim-1 received a series of seven (7) "redemption payments" from SCHAMENS totaling $350,000. The series of payments included: (i) one April 8, 2019 wire of approximately $50,000 that had been sourced from Victim-5's investment in the Algo Fund; and (ii) one June 10, 2019 wire of approximately $100,000 that had been sourced from Victim-7's investment in the Algo Fund.

27.    During the three-month period that Victim-1 had received approximately $350,000 of his requested $500,000 redemption, SCHAMENS failed to provide Victim-1 with certain documents, such as valuation sheets related to the investments, despite Victim-1's repeated requests. As a result, Victim-1 grew even more skeptical of SCHAMENS, and, toward the end of 2019, advised SCHAMENS that he wanted to withdraw the balance of all of his investments, including investments made on behalf of Victim-1's wife and the Victim-1 Company, totaling approximately $2.9 million. Shortly after making this request, Victim-1 received three (3) redemption payments between October 31, 2019 and January 2, 2020, totaling approximately $200,000, all of which had been sourced from other Victim Investors.

28.    Thereafter, in early 2020, SCHAMENS provided Victim-1 a redemption notice which provided that Victim-1's funds would be returned on a

quarterly basis beginning on May 15, 2020 through May 15, 2021 from another entity controlled by SCHAMENS ("Entity-4"). According to the redemption notice, the value of the Victim-1 Investments had grown substantially over the life of the investments, which was false based on a review of bank records associated with the Victim-1 Investments.

29.     Following receipt of the redemption notice, Victim-1 engaged in frequent communications with SCHAMENS via text message and email in which Victim-1 demanded explanations for the delays in receiving redemption payments. SCHAMENS consistently made excuses for the delays and continued to falsely assure Victim-1 that wire transfers had been sent or were pending.

30.     On June 10, 2020, Victim-1 received an email from an individual purporting to be an employee of Tradedesk that contained wire instructions for two wire transfers that were scheduled to be sent to the Victim-1 Company from TFG on June 15, 2020 and June 30, 2020 in the amounts of $100,000 and $200,000, respectively. The email attached two forms with details regarding the wires. A review of the forms revealed that the wires were scheduled to be sent on June 15, 2020 from an account held by TFG Trading at Bank-2 ending in 5525 (the "Bank-2 TFG Account").

31.     A review of the Bank-2 TFG Account revealed that on June 10, 2020, the date the above email was sent, the Bank-2 TFG Account had a balance of $1. On June 15, 2020, the date the wires were supposed to be sent, the Bank-2 TFG Account had a balance of $64. Indeed, a review of the Bank-2 TFG Account revealed that between January 3, 2020 and in or around November 2021, the Bank-2 TFG Account never had a balance higher than $42,044. Based on a review of the Bank-2 TFG Account, SCHAMENS falsified the wire transfer forms sent to Victim-1 to provide Victim-1 with the false assurance that wire transfers were forthcoming.

32.     To date, Victim-1, Victim-1's wife, and the Victim-1 Company have not received any additional redemption payments from SCHAMENS or the Trading Groups related to the Victim-1 Investments and have suffered total losses exceeding $2.6 million.

**Victim-2**

33.     Victim-2 met SCHAMENS in or around 2014. Between May 7, 2015 and June 30, 2016, Victim-2 invested a total of approximately $499,000, (the

13

"Victim-2 Investments") in the Trading Groups based on representations made by SCHAMENS, including that the Trading Groups would generate an estimated monthly return of approximately 1 to 1.5%.

34.    In or around June of 2017, Victim-2 withdrew $50,000 from his investment account.  A review of bank records revealed that these funds were sourced from an investment made by the Victim-1 Company in TFG on June 8, 2017.

35.    In or around October 2018, Victim-2 requested an additional $70,000 redemption (the "Victim-2 70K Redemption").  Victim-2 had difficulty obtaining this redemption and received a series of unsuccessful money transfers and a bounced check from SCHAMENS during the time between the initial request and his eventual receipt of the funds on January 23, 2019.    The investigation revealed that the Victim-2 70K Redemption was paid via funds that had been invested by Victim-3 and Victim -4 on the same day, as discussed below.

36.    On June 11, 2020, Victim-2 was also able to withdraw approximately $13,000, which was transferred from the Bank-2 TFG Account to Victim-2's IRA at Entity-1.  SCHAMENS transferred those funds as an indication that a full redemption would be forthcoming.  Based on this investigation, the $13,000 transferred to Victim-2 was sourced from an investment made by another of the Victim Investors.

37.    Similar to Victim-1, in early 2020, Victim-2 received a redemption schedule from SCHAMENS.    The document was almost identical to the redemption schedule that had been provided to Victim-1 and indicated that Victim-2 would receive quarterly-redemption payments from Entity-4 beginning on May 15, 2020 through May 15, 2021.  The redemption schedule listed the purported value of Victim-2's individual investment as $634,676.11 (up from an original investment of approximately $405,000).    The redemption schedule further listed the value of Victim-2's IRA as $201,311.02 (up from an original deposit of approximately $94,000).

38.    A review of bank records associated with Victim-2's investments demonstrated that SCHAMENS did not invest Victim-2's funds as promised. Rather, SCHAMEN's funneled the money through various successive transfers to accounts he controlled and ultimately used the funds to: (a) finance Schamens' lifestyle; (b) pay personal debts, including legal fees; (c) pay back prior

14

victims in the manner of a Ponzi scheme; and (d) finance other expenditures unrelated to the investments made by Victim-2. For example:

      i.     As set forth above, on June 30, 2016, Victim-2 caused $94,168.87 to be transferred from Entity-1 to the Bank-1 TFG Account as an investment in TFG. At the time of the transfer, the Bank-1 TFG Account had a balance of $2.01. Shortly after the funds entered the account, $94,135.00 was transferred to the Bank-1 Tradedesk Account, which had a balance of $245.45 at the time of the transfer.

      ii.    Following the transfer to the Bank-1 Tradedesk Account, between June 30, 2016 and July 5, 2016, $73,100 was transferred from the Bank-1 Tradedesk Account to the Bank-1 Bold Analytics Account. At the time of the first transfer, the balance on the Bank-1 Bold Analytics Account was $0.67.

      iii.   Following the transfers to the Bank-1 Bold Analytics Accounts: (a) a total of $26,000 was wired to two different foreign-based bank accounts; and (b) approximately $22,015.00 was transferred to the Bank-1 SCHAMENS Account, where the funds were used for apparent personal expenditures. The remaining funds were used for purchases and other expenditures that had no apparent connection to the Victim-2 Investments.

39.   On July 7, 2020, Victim-2 received a redemption payment of approximately $41,969.00. Bank records revealed that the majority of these funds had been sourced from an investment made by Victim-5 in The Algo Fund on July 1, 2020.

40.   To date, Victim-2 has not received any additional redemption payments from SCHAMENS and has suffered total losses of approximately $324,000. Similar to Victim-1, Victim-2 also communicated with SCHAMENS regarding the redemption payments and received similar emails and text messages calculated to lull Victim-2 into a false sense of security.

Victim-3 and Victim-4

41.   Between in or around April 2016 and January 23, 2019, Victim-3

15

and Victim-4 invested a total of approximately $510,000 in TFG (the "Victims-3/4 Investments").   Prior to the Victims-3/4 Investments, SCHAMENS represented to Victim-3 and Victim-4 that: (a) TFG would generate annual returns of approximately 15%; and (b) their investment funds would never leave their account and were only intended to provide buying power to TFG's traders.

42.   Following their investments, Victim-3 and Victim-4 were provided with monthly account statements showing that their investment in TFG was earning significant returns.   For example, Victim-3 and Victim-4 received a monthly statement for February 2019, which showed that the total value of their investment was approximately $834,000 and had earned approximately $15,519.06 in February 2019 alone.   In reality, SCHAMENS had already used Victim-3 and Victim-4's investments for various non-investment purposes, as explained in greater detail below.

43.   A review of bank records associated with Victim-3 and Victim-4's investments revealed that SCHAMENS did not invest their funds as promised. Rather, SCHAMENS funneled the money through various successive transfers to accounts he controlled and ultimately used the funds to: (a) finance SCHAMENS' lifestyle; (b) pay personal debts, including legal fees; (c) pay back prior victims in the manner of a Ponzi scheme; and (d) finance other expenditures unrelated to the investments made by Victim-3 and Victim-4.   For example:

> i.    On January 23, 2019, Victim-3 and Victim-4 caused $100,000 to be wired from their personal bank account to the Bank-1 TFG Account.   At the time of the wire transfer, the Bank-1 TFG Account had a negative balance of -$13.   Shortly after the funds entered the account, SCHAMENS transferred $99,980 from the Bank-1 TFG Account to the Bank-1 Tradedesk Account.   At the time of the transfer, the Bank-1 Tradedesk Account had a negative balance of -$30.66.

> ii.    On January 23, 2019, a total of $70,170 was transferred from the Bank-1 Tradedesk Account to the Bank-1 TD Account.   At the time of the transfer, the Bank-1 TD Account had a negative balance of -$63.94.   That same day, SCHAMENS wired the Victim-2 70K Redemption from the Bank-1 TD Account to Victim-2.

> iii.    In addition to the above, beginning on January 23, 2019 through on January 24, 2019, SCHAMENS made six different

transfers totaling approximately $28,300 from the Bank-1 Tradedesk Account to the Bank-1 Bold Analytics Account. Prior to these multiple transfers, the Bank-1 Bold Analytics Account had a balance of $3.52.

iv.     During the same two-day period and following the successive transfers into the Bank-1 Bold Analytics Account, SCHAMENS transferred via three separate transactions, approximately $8,500 to his personal account at Bank-1. SCHAMENS then used those funds to pay personal expenses.

v.     Also on January 23, 2019, approximately $13,542.40 was transferred from the Bank-1 Bold Analytics Account to Entity-3.

44.     In or around 2020, SCHAMENS approached Victim-3 and Victim-4 regarding a new investment opportunity that involved the use of an algorithmic trading formula that SCHAMENS claimed to have developed—the Algo Fund. SCHAMENS told Victim-3 and Victim-4 that he was tired of dealing with TFG's traders and wanted to transition into the health savings plan market. Specifically, SCHAMENS claimed that he could entice companies in possession of health savings accounts to invest those funds in the Algo Fund. SCHAMENS led Victim-3 and Victim-4 to believe that the Algo Fund would be used to increase the value of the health savings accounts while also generating profits for the Algo Fund's investors.

45.     Based on SCHAMENS' representations, on November 11, 2020, Victim-3 and Victim-4 agreed to transfer the balance of their TFG investment to the Algo Fund. As part of that transfer, SCHAMENS provided Victim-3 and Victim-4 with the Algo Fund Offering Memo.

46.     In addition to the Algo Fund Offering Memo, Victim-3 and Victim-4 signed a subscription agreement (the "Algo Fund Subscription Agreement"), which indicated that the total value of Victim-3 and Victim-4's TFG investment was $1,035,000. The Algo Fund Subscription Agreement again made clear that the subscription in the Algo Fund was for "investment purposes only."

47.     Sometime following the transfer of their investment to the Algo Fund, Victim-3 and Victim-4 began to request redemption payments to be made

17

from their investment account. But Victim-3 and Victim-4 had difficulty withdrawing any funds from their account. SCHAMENS often cited issues such as inclement weather, travel, and illness as reasons for the frequent delays in releasing their funds. On May 29, 2021, Victim-4 sent an email to SCHAMENS with the subject line "Wits End!" The email stated:

> David,...We just don't know what to do to get our funds from you. This journey began last October. I have, as you know, a long string of emails from you promising "the end of the week" or "by next week," [o]r even "the wiring center is in Dallas and is shut down because of the freeze." Could you please tell me when you are actually going to distribute the funds?

48.     Following the above email, on June 14, 2021, Victim-3 and Victim-4 received a redemption payment of $150,000. Based on this investigation, those funds were sourced from investments made by two Victim Investors who had invested a total of $380,000 in the Algo Fund on June 11, 2021.

49.     To date, Victim-3 and Victim-4 have not received any additional redemption payments from SCHAMENS and have suffered total losses of approximately $360,000.

Victim-5

50.     Between March 5, 2019 and July 1, 2020, Victim-5 invested, either personally or through a company owned by Victim-5, approximately $190,649.93 in the Algo Fund through SCHAMENS (the "Victim-5 Investments"). In order to invest in the Algo Fund, Victim-5 signed an Algo Fund Subscription identical to the agreement that SCHAMENS had provided to Victim-3 and Victim-4. Victm-5 further acknowledged receipt of the Algo Fund Offering Memo.

51.     A review of bank records associated with the Victim-5's Investments revealed that SCHAMENS did not invest Victim-5's funds as promised. Rather, SCHAMENS funneled the money through various successive transfers to accounts that he controlled and ultimately used the funds to: (a) finance SCHAMENS' lifestyle; (b) pay personal debts, including legal fees; (c) pay back prior victims in the manner of a Ponzi scheme; and (d) finance other expenditures unrelated to the investments made by Victim-5. For example:

      i.      On April 8, 2019, Victim-5 caused $50,000 to be wired from an IRA held by Victim-5 at Entity-1 to the Bank-1 Algo Fund Account. At the time of the transfer, the Bank-1 Algo Fund Account had a balance of approximately $14. On the same date, SCHAMENS transferred $50,000 from the Bank-1 Algo Fund Account to the Bank-1 Tradedesk Account. At the time of the transfer, the Bank-1 Tradedesk Account had a balance of approximately $8,000.

      ii.      After the funds were received into the Bank-1 Tradedesk Account, SCHAMENS transferred $50,050 from the Bank-1 Tradedesk Account to the Bank-1 TFG Account. At the time of the transfer, the Bank-1 TFG Account had a balance of $2.

      iii.      Following the transfer, SCHAMENS wired $50,000 from the Bank-1 TFG Account to a bank account held by the Victim-1 Company as a redemption payment related to Victim-1's investment in TFG. All of the above transactions occurred on or about April 8, 2019—the date of Victim-5's investment.

52.     Victim-5 has suffered total losses of approximately $190,649.93.

Victim-6

53.     Between March 12, 2019 and January 2, 2020, Victim-6 invested a total of approximately $280,000 in the Algo Fund through SCHAMENS (the "Victim-6 Investments"). Victim-6 made the investments by wiring funds directly to the Bank-1 Algo Fund Account and another account held by the Algo Fund at Bank-2 (the "Bank-2 Algo Fund Account"). Similar to Victim-3 through Victim-5, Victim-6 signed Algo Fund Subscription Agreements and acknowledged receipt of the Algo Fund Offering Memo.

54.     A review of bank records associated with the Victim-6's Investments revealed that SCHAMENS did not invest Victim-6's funds as promised. Rather, SCHAMENS funneled the money through various successive transfers to accounts he controlled and ultimately used the funds to: (a) finance SCHAMENS' lifestyle; (b) pay personal debts, including legal fees; (c) pay back prior victims in the manner of a Ponzi scheme; and (d) finance other expenditures unrelated to the investments made by Victim-6. For example:

19

a. On December 2, 2019, Victim-6 wired $59,400 from a personal bank account to the Bank-2 Algo Fund Account. At the time of the transfer, the Bank-2 Algo Fund Account had a balance of approximately $30. On the same date, SCHAMENS transferred $59,300 from the Bank-2 Algo Fund Account to an account held by TradeStream at Bank-2 ("the Bank-2 TradeStream Account"). At the time of the transfer, the Bank-2 TradeStream Account had a balance of approximately $53.57.

b. On the same date, SCHAMENS transferred $59,000 to an account held by SCHAMENS at Bank-2 (the "Bank-2 SCHAMENS Account"). At the time of the transfer, the Bank-2 SCHAMENS Account had a balance of approximately $614.

c. On December 3, 2019, the day after Victim-6's investment, SCHAMENS wired $58,500 to a law firm ("Law Firm-3") located in Greensboro, North Carolina. Based on a review of the wire details, law enforcement believes that the funds wired to Law Firm-3 were for closing fees associated with the purchase of SCHAMENS' home in Greensboro, North Carolina. Based on this investigation, SCHAMENS purchased the home on December 10, 2010, for approximately $1.1 million.

55.     Victim-6 has suffered total losses of approximately $280,779.96.

Victim-7

56.     Between June 6, 2019 and May 26, 2020, Victim-7 invested a total of approximately $631,000 in the Algo Fund through SCHAMENS (the "Victim-7 Investments"). Victim-7 made the investments by wiring funds from an account controlled by Victim-7 to the Bank-2 Algo Fund Account.

57.     A review of bank records associated with the Victim-7's Investments revealed that SCHAMENS did not invest Victim-7's funds as promised. Rather, SCHAMEN's funneled the money through various successive transfers to accounts he controlled and ultimately used the funds to: (a) finance Schamens' lifestyle; (b) pay personal debts, including legal fees; (c) pay back prior victims in the manner of a Ponzi scheme; and (d) finance other expenditures unrelated to the investments made by Victim-7. For example:

20

a. On June 6, 2019, Victim-7 wired $100,000 from a personal bank account to the Bank-2 Algo Fund Account. At the time of the transfer, the Bank-2 Algo Fund Account had a balance of approximately $5,100. The following day, SCHAMENS transferred $100,000 from the Bank-2 Algo Fund Account to the Bank-2 TradeStream Account. At the time of the transfer, the Bank-2 TradeStream Account had a balance of approximately $968.

b. On the same date, SCHAMENS transferred $100,300 from the Bank-2 TradeStream Account to an account held by Tradedesk at Bank-2 (the "Bank-2 Tradedesk Account"). At the time of the transfer, the Bank-2 Tradedesk Account had a balance of $0.

c. On the same date, SCHAMENS transferred $100,100 from the Bank-2 Tradedesk Account to the Bank-1 TFG Account. At the time of the transfer, the Bank-2 TFG Account had a balance of $0.

d. On June 10, 2019, SCHAMENS wired $100,000 to a bank account held by the Victim-1 Company in the form of a redemption payment related to Victim-1's investment in TFG.

58.    On June 11, 2021, Victim-7 received a redemption payment of $100,000 after repeated requests to SCHAMENS. Based on this investigation, those funds were sourced from investments made by two Victim Investors who had invested a total of $380,000 in the Algo Fund on June 11, 2021. To date, Victim-7 has not received any additional redemption payments and has suffered total losses of approximately $531,000.

21